[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, whose birth name was Altizer, was married to the defendant on October 14, 1978, at Lake Tahoe, Stateline, Nevada. The parties have one child, Danelle, born July 2, 1980. No other children have been born to the wife since the date of the marriage. The parties have not been recipients of any public assistance. The parties have met the residency requirements sufficient to confer jurisdiction in this court. CT Page 7868
On April 1, 1996, the parties accepted the recommendation of Family Services with respect to the issues of custody and visitation. That order was entered and this matter was continued for disposition on the financials issues of this marriage.
The plaintiff grew up and graduated from high school in Maryland, where the parties met and began dating. He had a degree in engineering from Louisiana State, and the parties moved to Idaho after the defendant established himself there in his new employment. He came back to Maryland, and asked her to move to Idaho, and be married. She did not want to just live with him, but wanted to be married. They moved to Idaho, and went to Lake Tahoe about six (6) months later to be married. He claimed that they had cohabited for approximately two (2) years prior to their marriage.
She owned a car, some furniture, and clothing when she entered the marriage. At that time she had some small savings, not to exceed Two Thousand ($2,000.00) Dollars. She owned no real estate, and no securities. She began a job at a local Safeway grocery store, and remained working until her pregnancy. She did not go back to work outside the home during the infancy of the child, and worked part-time some years thereafter.
The defendant had personal property as did she, and no real estate or securities, or savings of substance. His employment history demonstrates some periods of unemployment, occasioned by disappointment in the jobs he took, or interruptions while he applied for new positions.
The parties built a home in Idaho, which she said was very exciting. The home cost Seventy-three Thousand, Five Hundred ($73,500.00) Dollars, of which some of the cash down payment came from his parents. They purchased another home down the street from their original home a couple of years later. The defendant lost his employment due to his refusal to move to Colorado, and subsequent layoff. They moved to Cheshire, Connecticut, because his parents lived there and they lived with his parents for approximately nine (9) months, until they purchased the 4 Sandy Acres, New Milford, property.
The property consists of a cape-style home which she values on her financial affidavit. The home is jointly owned and currently occupied by the defendant. The order of the court is that he maintain all mortgages and carrying charges on that residence. CT Page 7869
The defendant left his employment with Morganti in 1992 or 1993 because of new and better employment with Seamack (sic) another construction company, but he was only there for two weeks because he did not want to work weekends. He claimed great disappointment in that job due to unethical business practices. He was terminated. Thereafter, he was unemployed for seventeen to eighteen months. Savings were used to fund the family expenses, stocks were sold, and his parents helped them. The plaintiff claimed that the defendant was not aggressively pursuing new employment.
She became very concerned about the marriage in April of 1994, when the defendant called her at work to tell her that her brother had died. She thought it was insensitive that he not come to work to tell her, or wait until she arrived home to tell her. Her brother was 47 and died of a heart attack on the way to work. She continued her testimony to add that for the last three years of the marriage, he withdrew any emotional or physical support of her and their daughter. On cross-examination, she agreed that he contributed to the household maintenance and chores. She grudgingly agreed that he was a good cook, but cooked only when he was not working or had time.
She left the marital home in June or July of 1994 with the child, because he would not. She had served him with this action just prior thereto. She testified that they had had discussions for six (6) months about whether or not he would get a new job, and he remained ensconced in the family home, was not working, and she did not see that he was making any real attempts to change the way he was living.
She came back from a funeral and the wedding of her first child, both in Maryland, to discover that her ATM card was taken from her by the bank, she panicked, and brought a divorce action. She thought she would be left without funds, so she went to see her lawyer within a week or less. She denied that she saw her lawyer the next day. During cross-examination, and a review of the transcript from the hearing with Judge Walsh, her recollection was refreshed that she saw counsel on June 6, the day after the incident at the bank occurred. The defendant was served on June 7. She denied that she observed his being served with some humor.
At the time she left, she felt that she had no alternative. She moved into the home of a woman friend with their daughter. They remained there for six (6) months, moved into an apartment, CT Page 7870 then moved to their current apartment one year later. She resides in a one bedroom apartment, which is occupied by her daughter. The plaintiff sleeps on an couch which opens into a bed in the living room. The plaintiff seeks the return of personal property, submitted in a handwritten list submitted with her proposed orders. The defendant agrees with that list, and is ordered to return that property to the plaintiff within thirty (30) days of the judgment.
During cross-examination, the plaintiff agreed that she really wanted to move back to Maryland, and that, while her husband did not ask her to leave, someone had to. She withdrew a large sum of money from a joint equity line of credit, concerning which Judge Walsh held a three day pendente lite hearing, and entered orders with respect to those funds being used for child and family support during the pendency of this action. She stipulates through counsel that she did not obey the order of the court, served on June 20, and Judge Walsh entered orders and further articulated any sanction which the court deemed appropriate at the time. She also agreed that she took all of the securities held by the parties when she left on June 8, 1994. She asked this court for a restraining order on assets after she had removed the securities and withdrawn Thirty Thousand ($30,000.00) Dollars from the joint equity credit line.
She denied that she had planned to take all of their assets and move back to Maryland prior to any problems arising over the communication of her brother's death by the defendant. She denied telling the defendant's mother that she could not cope with her first daughter, and then that her decision to have her first daughter live with her brother caused great disruption in the marriage.
On cross-examination, she denied that they had had difficulties in their marriage during the time they resided in Idaho, concerning whether or not her child from her first marriage should be placed into an institution. She agreed that there was a period of two years when the issue was primary for them. Her first child then moved back to Maryland to live with the plaintiff's brother. She denied that they discussed divorce during the time they lived in Idaho.
The defendant claims through cross-examination that the plaintiff was underemployed during the course of the marriage, and that the defendant was the productive wage earner. The defendant was college educated, while the plaintiff is a high school CT Page 7871 graduate, and is relegated to low-income, primarily female jobs.
Since she vacated the family home, she has been employed full time at an answering service, and has a part-time job at Stop 
Shop in the floral department. Her current income is reflected on her financial affidavit. She has medical insurance through her employment at Stop Shop, for which she pays a premium. Their child, she believes, is covered by her father's medical insurance. She has had medical expenses, and the plaintiff has been paying them because she claims that she has no forms for submission of claims to the defendant's company.
She denies during cross-examination that the parties had any discussions concerning the allocation of some of the stocks for the college education of their daughter. She denied that the parties had any disagreements concerning the raising of their daughter. She denied arguments about the kinds of movies or TV she should be exposed to. She testified that they never argued about anything, but that they discussed issues. On redirect, she claimed that they had no depth of conversation, or resolution, and that this process occurred over time ending in complete estrangement. She called her feelings "abandonment" in the context of having nothing in common with her husband which they could share. Even when she asked him to be included in activities, she testified that he refused.
She agreed that the defendant managed the finances of the family, and conceded that he did a good job with that. During the course of the marriage, she agreed she was well-provided for, as was the family. She denied that she articulated that she would always stay with him because he was such a good provider, and certainly better than her first husband. On recross, she admitted that their marriage had ceased to have any meaning to each of them, and that the death of her brother was an event that caused her to rethink what she was doing. She also agreed that since he had lost his job, and she was working full time, she did not feel as well provided for.
The defendant's mother testified. She resides in Cheshire. She called her son's families' stay with them in Cheshire to be a wonderful opportunity. She testified that the plaintiff was very upset following the move from Idaho, because of the decision she had made to send her first daughter to Maryland to live with her brother. The witness testified that the plaintiff expressed wanting to "get out", but that she could not face being away from CT Page 7872 her second child and that she did not want to leave the child with the defendant. The plaintiff asked her mother-in-law to take the child if anything should happen to her, and she agreed. On cross-examination, she acknowledged that the plaintiff was under a great deal of stress, and she did not mention this conversation to her son because of that. She did not want to upset the situation more.
The witness testified concerning gifts to the parties and to the child. Those gifts were in the form of stocks, some of which were expended by the defendant.
The defendant was called to testify by the plaintiff. His employment since the parties' separation consists of employment at Quality Food Oils in New Milford, commencing in July of 1994, where he was paid Seven ($7.00) Dollars per hour, and then to Mannion Construction in Danbury, Connecticut, at the beginning of 1995. He continues in that employment. He is their financial controller, paid Forty-six Thousand ($46,000.00) Dollars per year.
The plaintiff produced twelve copies of bank statements for his checking account which represent the months of July, 1995 through June, 1996 as Pl. Exh. 5. There appears to be a partnership account along with the individual account. On the September, 1995 statement, a figure of Eighteen Thousand ($18,000.00) Dollar entry is present. The defendant keeps this account in his name alone. There had been stocks held in Citizens' Utilities in joint names. The defendant purchased some like shares prior to the marriage, gifted some to the daughter, and received others as gifts from his parents. The total stock held is reflected on his financial affidavit, and a summary was provided to assist the court. The stock held in his name alone, purchased prior to the date of the marriage, appreciated substantially during the marriage. The Citizens' Utilities Stock had a total value at the time of the marriage of One Thousand, One Hundred, Forty-seven ($1,147.00) Dollars, and the Japan Fund was worth Fifty ($50.00) Dollars. The plaintiff claims that the increase in the value of that stock should be considered as part of the marital estate.
In August/September, 1995, the deposit into the checking account appears to increase and was due to a raise is salary. In February, 1996, the statement reflects a deposit in excess of the norm. He received a federal tax refund that month. He did not have a full work year, hence the refund. June 7, 1996 statement discloses a deposit in excess of Ten Thousand ($10,000.00) Dollars, CT Page 7873 approximately Three Thousand ($3,000.00) Dollars in excess of his pay check. He explained that he borrowed against the cash value of his life insurance policy.
Heritage Investors is noted on his financial affidavit and he claims that it is a roll over from his termination from Morgenti, and is distinct from the Eighteen Thousand ($18,000.00) Dollar payment to him which was from their defined benefit plan which thereafter was liquidated.
During the marriage, he converted stock to cash to maintain the family while he was unemployed. He cashed in approximately Ten Thousand, Five Hundred ($10,500.00) Dollars in stock which were in a custodial account for Danelle, and a small sale during the time they lived in Idaho of approximately Five Thousand ($5,000.00) Dollars, but his recollection was not exact. That withdrawal came from stocks in his name alone.
He agreed that he had sold approximately Eight Hundred ($800.00) Dollars during the pendency of this action, and after a restraining order on assets had been entered, so that he could pay the mortgage. He also holds approximately One Thousand, Nine Hundred, Fifty ($1,950.00) Dollars in Savings Bonds, held in Danelle's name. They are stored in his safe in his home. When asked by the plaintiff, the defendant testified that his credit card balances are zero, and that he has four credit cards, each with Ten Thousand ($10,000.00) Dollars of available credit.
The defendant does not maintain a savings account for the minor child, other than the Savings Bonds previously testified to. Title to the parties' motor vehicles are in the defendant's name. The plaintiff drives a 1990 Toyota, and the defendant concedes that she may retain that. He believes that the 1990 Toyota was worth Eleven Thousand ($11,000.00) Dollars in 1994, and that the 1985 Toyota was worth Two Hundred, Fifty ($250.00) Dollars. He currently values the 1985 Toyota at Five Hundred ($500.00) Dollars on his financial affidavit. The court orders that he convey title to the 1990 automobile to her within thirty (30) days of the judgment.
The defendant has a border, Mr. Tuthill, who pays him room and board. He met him while employed at Quality Oils. He does not show that payment of One Hundred ($100.00) Dollars per week on his financial affidavit, but testified that he had reduced his expenses on his financial affidavit. His testimony with respect to CT Page 7874 decreasing the expenses was not terribly credible to the court, insofar as he claimed that the reductions were in electricity and telephone expenses. Additionally, the defendant, apparently with the consent of counsel, borrowed almost Ten Thousand ($10,000.00) Dollars from a life insurance policy after a restraining order on assets. A review of the language of the motion and orders might give rise to an argument that the language does not prohibit the defendant from such a loan. The spirit of the order however, mitigates against such a reading, and the court finds that the defendant was not entitled to such a transaction. The court will include the total amount of the cash value of the policy in its computation of marital assets.
The defendant claims that the plaintiff spent all of their discretionary income and that they were unable to save any significant sums of money other than his retirement. He claims that she earned very little outside the home.
The defendant tearfully recounted his upset that the plaintiff had allowed her first child to be raised by her brother in Maryland after the birth of Danelle. The first child was twelve, and Danelle, four years old when that transfer took place. At that time, the family was getting ready to relocate to the East. He claimed that her favoritism of their child over the plaintiff's first child disturbed him. The court found the testimony a bit of a stretch since the defendant had never adopted this child, and it was his child with the plaintiff who had been favored.
The defendant testified that the parties saw a therapist surrounding the issues of the first child being sent away, and he claimed that the issues were marital as well as about the children. He claimed that she "followed the path of least resistance" when it came to caring for the children. The easiest tended to be in allowing them to do whatever they wanted to do. At the time they moved to Connecticut, he was concerned that their daughter was not thriving physically. He took the child to a pediatrician and was encouraged that while small, she was healthy. She is a healthy sixteen year old who is in therapy to renew her relationship with her father.
The defendant testified that his concerns about the child, and his disagreement with his wife led him to stop loving his wife. He testified that his daughter was his only "ray of hope" and that he confronted his wife, at least once in Connecticut, that she did not love him or have warmth for him, to which she did not respond. CT Page 7875 There was no affection or warmth from his wife during their time in Connecticut. When he worked late, she did not prepare dinner for him. During the last six or seven years of their lives together, she would be in bed with Danelle watching TV, and did not greet him.
The defendant also testified that on the day the divorce was filed, he was taken by surprise. They had returned from her first child's wedding, and on that Monday, her ATM card was refused at the bank. She came back, livid, and he had never seen her that mad. She yelled that he had stolen all their money, that he was going to leave her. When he asked what was going on, she told him. He went to the bank to clear up the difficulty, and when he came back, she, Danelle, the stocks, everything in his safe, were "stolen". He did not immediately discover that all of the property had been removed that day, but did shortly thereafter. The defendant, while unhappy in the marriage, claimed that he had no intention to leave the marriage, or divorce her. He was committed to staying married for the daughter. He felt he had to stay so that Danelle had some "balance" in the home.
When the plaintiff returned to the home later, she told him that she had just spoken to the best divorce lawyer, and that she would take everything and go to Maryland. He testified that he was stunned. He tried to talk to her, but she laughed. On the next day, the sheriff served him, while the plaintiff and Danelle were present together. He claimed she smirked and said "I told you what I was going to do." Before she left the house, after he had removed himself from the master bedroom, one early morning went to that room, took his locked briefcase, pried it open, saying she was looking for a diamond ring. He grabbed the briefcase away from her, and he left the home to stay at his parents. He had not asked her to leave the house, prior to that time, and they had discussed whether they should live together, but she wanted him to leave. He did not agree to leave, occasioning her move with Danelle from the marital home. He communicated to her that this was his house, and that he did not intend to leave. They had an incident over car keys, where he testified that he felt goaded, and she said hit me, hit me, whereupon she called 911. No police officer responded. She went to Danelle's room, held her in front of her, and said "Your father's attacking me." He was devastated. Danelle told her father she hated him, and that she did not want him to be her father. It was the first time he had ever been told anything like that. His ability to have a relationship with the child thereafter was compromised, and he did not see her for some time. They did CT Page 7876 speak on the telephone, and they visited, but Danelle was afraid of him. They spent some time with each other, but she said she did not want to see him. He testified that she said he did not love or care for them, and that he was not worthy of being her father. He cried during this testimony, and testified that he was devastated, that she "was the only thing I have." His impersonal possessory language concerning the child was of grave concern, especially since she is a female child. Like the assets of the marriage, they were "his" and over which he exerted control. While the assets of the marriage were preserved because of his financial acumen, the ability to utilize the same "investment strategy" concerning a child seems not to have worked so well for him. Of course, he blames the plaintiff mother for this, and may have to engage in some introspection concerning his overall treatment of the women in his home.
He testified that he did not want his wife to leave, that he wanted to maintain the relationship with his family in the home, until at least the child entered college. When she left, it was apparent to him that the marriage was "dead" and that it was no longer possible for them to reconcile even for the child.
The defendant tracked their purchases of homes during the course of the marriage. Their first home was purchased with the down payment of Eight Thousand ($8,000.00) Dollars from his savings accumulated prior to the marriage. For the purchase of their second home, the defendant added Six Thousand ($6,000.00) Dollars from the sale of stock to the net proceeds from the sale of their first home. When the parties bought their current home, they lost money on the sale of their second home, but applied Seventeen Thousand ($17,000.00) Dollars of the net proceeds from that sale, to the New Milford property. The defendant concedes that the request of the plaintiff for Ten Thousand ($10,000.00) Dollars as one-half of the equity of the family home is a fair request.
He claimed that the plaintiff made no financial contribution to the acquisition of the property. He further claimed that she spent ninety (90%) percent of the family's discretionary income. His complaint was that she spent on clothing and other personal items. He claimed that he did sixty (60%) percent of the household labor, and one hundred (100%) percent of the outside maintenance of the home. In her rebuttal testimony, she laughed at that suggestion. She claimed that she had remained in the family home as a homemaker, and that she mowed the lawn during the week so that their weekends would be free for family activities. She cried when CT Page 7877 she testified that she wanted them to have weekend time together, but that he never was interested.
He claimed that his initial income was Twenty Thousand ($20,000.00) Dollars which rose to Forty-six Thousand ($46,000.00) Dollars. He claimed that any period of unemployment was occasioned by an unwise job change choice, where he questioned the ethics of the accounting practices in the employment. He claimed that he would be reemployed easily, which did not occur. He claimed that they used Ten Thousand, Five Hundred ($10,500.00) Dollars from the Citizens Utilities account for tax reasons. He admitted during cross-examination, that he had not consulted with the plaintiff before cashing in the stock. One other period of unemployment occurred in Boise, which was for a seven (7) month period wherein he received unemployment benefits. He claimed that they did not use any more than Five Thousand ($5,000.00) Dollars during that time.
The defendant claims that he is concerned that his daughter is not aiming highly enough, and that the plaintiff does not have the same motivation to ensure that Danelle is educated to her full potential. Based upon the earlier observations of the court, the court is concerned that his view of the abilities of his wife sent a stronger message to the daughter than he realized.
The defendant currently sees a therapist, and that therapist has been of immense help to him. He has also seen Danelle's therapist with his daughter, and felt that it was wonderful. He is encouraged about his relationship with his daughter. He will continue in that counseling process. He hopes that Danelle will allow him to continue to be involved in that process, and that the plaintiff will also join the process.
The defendant has not paid any of the principal on the debt owed and noted as a second mortgage on his financial affidavit. He drew down on the credit line to pay the debts on credit cards which were part of the total found to have been appropriated by the plaintiff by Judge Walsh. He plans to refinance the property and will assume the balance due on the credit line, as well as the first mortgage. He seeks a conveyance of the marital home, to which the plaintiff does not object, subject to the payment above.
The plaintiff testified in rebuttal. She claims that the value of the 1990 Toyota that she drives is Eight Thousand, Five Hundred ($8,500.00) Dollars. CT Page 7878
The plaintiff denied that she was opposed to college education for their daughter. She described that she and her older daughter will travel to visit schools in the fall, and they have written for information. She testified that after Danelle was born, her first daughter was eight years old, and helped her with the baby. Because Kim's father died shortly after their move to Boise, she had suffered emotionally, and the birth of the new child, exacerbated the problems. Ultimately, she was unable to handle the child's self-destructive actions, and the intervention of a psychiatrist did not resolve their conflict, leading to the child's move back to Maryland with her brother. Remarkably, the defendant denied knowing about the incidents.
The plaintiff was tearful, frustrated, and angry concerning her husband's testimony, and the fact that the case was being tried. She testified that he was in total control of the family finances, the buying and selling of stocks, and major purchases. When she claimed that she was desperate when she withdrew funds from the bank, and when her ATM card was taken at the bank, she panicked, thinking that in his period of unemployment, all of their assets had been dissipated. She was not made aware of what they had over time, and had no idea what the status of their finances were.
The end of the case, which in total was protracted compared to the relative worth of the assets of the marriage and the parties, became heated and hyperemotionalized. The parties both testified that they did not fight during the marriage. They certainly did in the court context, with the court having to admonish the plaintiff as she left the witness stand after her rebuttal testimony, and went to approach the defendant. The parties clearly did not have any reasonable way to articulate their complaints concerning the other, nor any habit of resolution of conflict.
It was apparent from the testimony that the actions of the plaintiff in removing assets was not acceptable, but understandable in the context of the whole case. That issue was addressed by the court, and sanctions were imposed. The issue of the defendant's lack of compliance with the order of the court was not addressed, however, because it occurred subsequent to that court hearing. After complaining to this court, and having an extended hearing, and asking for a restraining order, the defendant now claims that he "misunderstood" that the order did not apply to a loan on his insurance policy. The court finds that he willfully violated the CT Page 7879 order he requested, as if it only applied to the plaintiff, but not to him. His disregard of the court order will be dealt with by the court's assessment of his overall credibility and in the distribution of assets under all of the circumstances.
The court is troubled by the use of equity line funds for current child and spousal support, insofar as that amount will be repaid with interest, and insofar as the calculation of property distribution will be affected. The use of those funds for support was generally unwise. The parties had a hearing however, pressing the issue before the court, and with the consequence that one party requested that the funds be so used. Apparently, the defendant had a pattern of using invested funds to fund current family expenses when he chose to be unemployed, and he did so unilaterally.
The court will therefore not apply the full value of the expended funds as charges against the interest of the plaintiff in the joint assets of the marriage. It is clear that the defendant acquired the stock and investment assets during this marriage, and that the equity in the real estate was also developed during the marriage. The testimony concerning gifts is construed by the court to be gifts to the parties and the child, and if the securities are not in the name of the child, then they are assets of the marriage. Because the defendant held most of the assets in his name, rather than acknowledging the participation of the plaintiff in this marriage, the court will find that her equitable interest is one-half of that property. What he chose not to recognize, will be recognized by this court. The gifted stock is joint property, and the decision of the parties with respect to the interest of the child in that property will be their moral judgment to make.
Based upon a review of the evidence in light of the statutory criteria enunciated in Conn. Gen. Stat. Sec. 46b-81 et seq., the court enters the following orders as its judgment in this case.
1. Parenting orders. The parties shall continue to parent the child jointly. The child will live primarily with her mother, and the father shall spend time with the child as the child and the father agree with the help of their therapists. The father and the daughter shall remain in counseling to assist the development of their relationship, and the plaintiff shall join that counseling if it is the request of either therapist. The plaintiff shall engage in her own supportive therapy to address issues of self-esteem, anger, and parenting issues which will impact the relationship between the father and daughter. CT Page 7880
2. Child Support. The defendant father shall pay the sum of One Hundred Fifty ($150.00) Dollars per week as child support pursuant to the Uniform Child Support Guidelines, by contingent wage withholding directly to the plaintiff mother. Child support shall be retroactive to September 1, 1996.
3. Health-related insurance and unreimbursed expenses therefrom. The defendant shall retain the health-related insurance which presently protects the child and maintain that insurance in full force and effect until her eligibility therefor expires. The parties shall share any unreimbursed health-related expenses for the child, except that the defendant shall pay any unreimbursed portion of the child's therapist bill, or for any other psychological testing or intervention that is required.
The provision of Conn. Gen. Stat. Sec. 46b-84 (d) shall apply to the payment of the health-related expenses which are covered by insurance.
4. Life insurance. The defendant shall maintain his policy of life insurance in the face amount of Two Hundred Thousand ($200,000.00) Dollars and name the child as irrevocable beneficiary thereof until his obligation to pay support terminates. The plaintiff shall be the contingent beneficiary, until the obligation to pay alimony has terminated, and trustee for the daughter, should the policy ever have to be paid. The plaintiff shall maintain the current policies of life insurance as reflected on her financial affidavit, and name the child as irrevocable beneficiary thereof. The plaintiff shall name the defendant as trustee thereof should the policy ever be paid during the minority of the child.
5. Alimony. The defendant shall pay the sum of Seventy-five ($75.00) Dollars per week as periodic alimony for a period of ten (10) years, or until her death, remarriage, or cohabitation pursuant to the statute. The term of alimony is non-modifiable, but the amount is modifiable upon a showing of a substantial change in circumstances. The plaintiff clearly relied upon the support of the defendant during the course of the marriage, and he followed a habit of acquiescing to her part-time employment in lower wage jobs. He reiterated his interest in maintaining the marriage for the child, and the court infers from this that the patterns that they adopted in the marriage were part of their contract with one another. While he complained about her spending habits, the parties did not seem to discuss that issue to attempt to resolve it CT Page 7881 any more than any other issues between them. Their inability to communicate about these issues left them unable to discuss the problem that erupted when her bank card was taken at the ATM machine, causing her panic, and the inappropriate way that this action was commenced. For the defendant now to expect her to be self-supporting is unrealistic. He was in control of the family money and investments, and left her with little education or involvement in making budgetary decisions. She is in need of continued weekly support from him.
Furthermore, the defendant shall cooperate with the plaintiff in allowing her to make an election to maintain, at her own expense, medical benefits pursuant to the Consolidated Omnibus Budget reconciliation Act.
6. Real estate. The plaintiff shall convey all of her right, title and interest in and to the marital real property, commonly known as 4 Shady Acres Lane, New Milford, Connecticut to the defendant. He shall assume and pay, and hold the plaintiff harmless from all encumbrances thereon from the date of the separation of the parties. He shall pay the plaintiff the sum of Ten Thousand ($10,000.00) Dollars for that conveyance within sixty (60) days of the date of the judgment. He shall refinance the mortgages thereon within five (5) years of the date of judgment so that the plaintiff's name is no longer on the mortgage. During the testimony, the parties appeared to agree that the defendant desired to maintain this property, and was willing to pay the plaintiff the amount above in consideration of her interest. In light of the testimony that her equity share may exceed that amount, the court ordered the payment as requested in the prayers for relief, and will deal with the discrepancies in its distribution of other marital assets.
7. Bank accounts and securities. The defendant shall share in equal portion the Citizens Utilities securities held jointly with the plaintiff and in his name alone, which were acquired prior to the marriage. The court finds that the appreciation in value of those securities occurred during the time of the marriage, and are marital assets. The defendant shall retain, and maintain for their daughter, those shares of Citizens Utilities which are in a custodial account for Danelle. Those funds shall not be used by the defendant for any purpose without leave of the court, except for her post-secondary education.
The Citizens Utilities securities and the Heritage Investors CT Page 7882 retirement account shall be shared equally, but be conveyed from the defendant to the plaintiff by either a Qualified Domestic Relations Order, or other rollover so as to avoid any tax consequences prior to retirement. The purpose of the order is to allow the plaintiff to have some small amount of retirement funds, insofar as all employment she held during the course of the marriage was without benefit of retirement funds. The defendant has asked the court to limit the distribution to the jointly held shares in Citizens Utilities, which total Forty-six Thousand, Two Hundred, Ninety-six and 06/100 ($46,296.06) Dollars. The court disagrees with the analysis of the defendant, and finds that the securities which he kept in his name alone are joint assets of the marriage, and has applied a fifty (50%) percent distribution to each party of this marriage.
The court has reviewed the miscellaneous assets reflected on the financial affidavits of the parties, wherein they list cash value of their life insurance policies, bank accounts, IRA's, gold and silver, and "frozen funds". The court has not included in this computation, the checking accounts used commonly by the parties, or the value they affix to household furnishings. The total of those assets, combined, is Twenty-five Thousand, Seven Hundred ($25,700.00) Dollars. The parties equal shares would equal Twelve Thousand, Eight Hundred, Fifty ($12,850.00) Dollars. The court orders that the parties retain those assets listed on their respective affidavits, but that, in addition thereto, the defendant pay to the plaintiff the sum of Two Thousand, Five Hundred and three ($2,503.00) Dollars to equalize the amounts. In making the computations, the court included the entire cash value of the defendant's life insurance policy, which he invaded despite the order of the court.
The court has been asked by the plaintiff to order the defendant to place certain assets into an account for the benefit of their daughter, and to require him to reimburse her account for stock sold during the marriage for the upkeep of the family during a period of his unemployment. The court will not enter such an order. The defendant's testimony concerning his election to use certain shares in the daughter's name for family support was credible, and the parties must now make their own informed and moral choices concerning the post-majority support of their daughter. The plaintiff has an older daughter to assist as well, and her ability to acquire earnings and assets in the future is much less than that of the defendant. He will have an opportunity to readjust to his expenses, and continue to invest, while CT Page 7883 maintaining the family home for the benefit of their daughter in the long run.
8. Debts. The parties shall be responsible for the miscellaneous debts which are reflected on their financial affidavits, and hold the other harmless therefrom.
9. The plaintiff wishes to have restored to her her birth name of Altizer. That shall be the name by which she is again known.
10. Personal property. The parties shall retain the automobiles which they presently are driving, as previously ordered herein. The parties shall cooperate in effecting the transfer of title to those automobiles, if necessary. The parties shall retain their personal property, which is currently in their respective possession, but for the list of personal property requested by the plaintiff, and attached to the claim for relief. The property shall be delivered to her, or pick up at a mutually convenient time for the parties.
Judgment shall enter dissolving the marriage on the grounds of irretrievable breakdown of the marriage. All orders herein shall enter as part of that judgment.
DRANGINIS, J.